New York Village Voice



# Blogs



| NEWS | | | | | | |
|---|---|---|---|---|---|---|
| NEW YORK NEWS | LOCAL NEWS BLOG | LONGFORM | THE FALL ISSUE | SCHOOLED | STUDIES IN CRAP | ARCHIVES |

**TOP BLOG STORIES**



**Rob Astorino Has a Plan to Save Us From Ebola**
By Katie Toth



**The Five Landlo— York 201—**
By Tess—

### Longform

# How a '50s-Era New York Knife Law Has Landed Thousands in Jail

By Jon Campbell Tue., Oct. 7 2014 at 10:19 AM       15 Comments
Categories: Longform

Like   Share  2.4k        Tweet  125                           27      +1  28



Click for a larger version. Photo courtesy of snyderstreasures.com
**The original gravity knife was used by German Luftwaffe paratroopers in World War II.**

**In retrospect,** Richard Neal knows he should have just gone home.

It was already nearly 4 a.m. on a sticky June night in 2008, and the LaGuardia Houses on the Lower East Side were crawling with cops. It was the kind of situation Neal normally prefers to avoid. Where police are, he'd rather not be.

A trim, soft-spoken 59-year-old, Neal has had his share of problems with the law. More than his share, in fact, as he'll readily admit. He has spent nearly a quarter of his life in prison. There was a burglary charge in 1978, followed by an assault charge in 1982. A nonviolent drug-distribution charge in 2002 landed him back inside.

Today, he acknowledges these incidents with some regret, in a voice that's incongruously deep and sometimes trails off mournfully. He especially regrets the crimes that involved hurting other people.

But he's a bit old for that kind of thing now. So Neal wasn't worried when he saw police prowling the grounds of the Lower East Side project that night in 2008. For once, Neal wasn't doing anything wrong. Even when two police officers approached and began asking questions, Neal was feeling just fine. His life had been inching back toward some semblance of order recently. After months staying with friends and family and bouncing between city homeless shelters -- common way stations for newly released prisoners -- Neal had finally found an apartment. For the first time in a long time, he had a place of his own.

And the fact that his new home was near the LaGuardia Houses, where his ailing mother lived, was just a bonus.

Besides, he'd been out of trouble for a good long while, and he certainly wasn't up to anything that night. He and a friend were just milling around outside the building, watching the action. In court testimony, a police officer would later describe Neal as "very calm," "just talking [and] walking" with his friend. Not making a scene. And when one of the officers, glancing down at Neal's baggy jeans, asked what he had in his pocket, Neal was honest.

"I told him, 'It's a knife,' " Neal says today.

There was no use in hiding it. It was clipped to the side of his jeans, for anyone to see. He'd been using the knife earlier that day, he said, at one of the odd maintenance jobs he'd been working in the years since he'd left prison.

Because of the life he'd led, Neal says, he "knew a little law" by the time he found himself -- at age 53 -- talking to police once again. He knew that the blade on his knife wasn't longer than four inches, the limit under New York City's administrative code. And aside from the length restriction, there's no law against carrying a folding knife in New York. It wasn't a butterfly knife or a brass-knuckle knife, not some exotic weapon from the movies. The Sheffield utility knife Neal had in his pocket is the kind of thing sold at hardware and sporting-goods stores all over the city. At the time, that model and ones more or less identical to it were stocked at Auto Zone, Pep Boys, Home Depot, Paragon Sports, and several other reputable hardware and outdoor-gear shops in the five boroughs. It's the kind of thing your outdoorsy uncle might carry. Today you can buy one on Amazon for less than 15 bucks.

Neal says he didn't start worrying that night until the officer used the term "gravity knife." He'd never heard that phrase before. And he *really* started to worry when the officer explained that his little Sheffield could land him in prison -- for years.

Neal ended that night in a squad car. There was only one problem: The knife he was carrying was not a gravity knife. At least, not by most of the world's definition.

According to the vast majority of police departments and district attorneys in New York State -- not to mention knife manufacturers, labor unions, and almost everyone else who knows a thing about knives -- what Neal was carrying was a perfectly legal folding knife. When gravity knives were banned under New York State law in the 1950s, the legislature actually had a very specific style of weapon in mind -- a foot-long terror that bears no resemblance to a knife like the one Neal had. True gravity knives, for all intents and purposes, have been extinct for the better part of a century; today they're relegated mostly to the antiques section on eBay.

Nonetheless, under the department's unique interpretation of Penal Code 265.01, almost

every pocketknife on the market today can be considered a gravity knife. It's as if authorities in New York City were using an antiquated law against flintlock muskets to prosecute BB-gun owners.

And the prohibition is as strict as it is all-encompassing. A knife that can be shoehorned into that definition is not only illegal to carry, it's illegal to possess at all, even within one's home. The only narrow exceptions apply to those "actively engaged" in hunting and fishing, and are essentially meaningless in New York City.

The penalties are severe, too, as Neal would learn. As a prior offender, he was eligible for a felony "bump up," rendering the pocketknife Neal possessed the legal equivalent of an unlicensed, unloaded pistol. Though the court said he likely had no idea his knife was illegal, and he wasn't accused of using it toward any nefarious end, he was convicted nonetheless.

After a series of appeals, he was sentenced to six years in prison.

These days, Neal is circumspect. "If I knew that knife had the capabilities of a gravity knife," he says, "I would have never had it in my pocket." The police in his neighborhood knew him. Why would he have given them an excuse to engage?

It's now June of this year, and Neal's seated on a couch in his daughter's apartment, at the Polo Grounds housing project in East Harlem, hands clasped atop his lap. He's been out of prison a few weeks, having served his maximum sentence. He's missed a lot in that time -- not least the birth of his grandchild, cooing just a few feet away, and the death of his mother, who succumbed to heart disease while he was gone. Through tears, he recalls being released just long enough to attend her wake.

Neal believes he was treated unfairly, and perhaps that's not surprising. But what may be surprising is how many people agree with him

[Single page]



Caleb Ferguson

**Richard Neal spent six years in prison because of the folding knife in his pocket.**

**For years, New York's gravity-knife law** has been formally opposed by a broad swath of the legal community. Elected officials call the statute "flawed" and "unfair." Defense attorneys call it "outrageous" and "ridiculous" -- or worse. Labor unions, which have seen a parade of members arrested for tools they use on the job, say the law is woefully outdated. Even the Office of Court Administration -- the official body of the New York State judiciary -- says the law is unjustly enforced and needs to change. They've petitioned the legislature to do just that.

But despite significant pushback from many legal experts, the half-century-old statute is the same as it ever was. In fact, it's been enforced with increasing frequency in recent years. Neal didn't know it at the time, but on that summer evening in 2008, he became part of a remarkable surge in gravity-knife arrests in New York City over the past 10 years.

Law enforcement agencies don't track gravity-knife crimes as a class, which may explain why the frequency of those arrests has gone largely unreported in the news media. But a *Village Voice* analysis of data from several sources suggests there have been as many as 60,000 gravity-knife prosecutions over the past decade, and that the rate has more than doubled in that time. If those estimates are correct, it's enough to place gravity-knife offenses among the top 10 most prosecuted crimes in New York City.

The increase seems to be the result of a confluence of forces. Changes in knife design have

played a part, as modern features have nudged the most popular styles closer to the edge of the legal definition. But the NYPD's stop-and-frisk program also may be one driver. A prime rationale for the policy has always been weapon recovery; former NYPD commissioner Ray Kelly put that goal front and center in a 2013 *Wall Street Journal* op-ed, pointing out that stop-and-frisk had "taken tens of thousands of weapons off the street" over the previous decade.

But about 80 percent of weapons recovered under stop-and-frisk were knives, according to an analysis of the department's own statistics. And experts say the vast majority of those were likely misclassified as "gravity knives." Whether deliberate or not, dramatically expanding the definition of an illegal knife has not only landed thousands of innocent people in jail -- it also had the effect of making stop-and-frisk appear far more effective than it actually was.



Click for a larger version.

**Prosecutions under the law that bans gravity knives have increased significantly over the past decade, a rise that largely tracks the increasing numbers of stop-and-frisk encounters through 2011.**

Darius Charney is a senior staff attorney at the Center for Constitutional Rights (CCR), one of the organizations that brought a landmark lawsuit against New York City, resulting in major reforms to the NYPD's stop-and-frisk practices. He said the *Voice*'s analysis illustrates what they've always argued: that stop-and-frisk is really about pursuing low-level crimes, not combating violence.

"When you're recovering a weapon which is really just a gravity knife, it's not about violent crime," Charney says. "It really calls into question the entire rationale that they've been using for years."

Gravity-knife arrests may be popular for another reason. Most, like Neal's, result from simple observation of a "pocket clip," often readily visible. All officers need to do is keep their eyes peeled, and they can add another misdemeanor to their tally -- or, if they're lucky, a felony.

Matt Galluzzo, a former assistant district attorney in Manhattan, now a defense attorney in private practice, says that for many officers, a gravity-knife arrest is simply a hard collar to pass up. "You don't have to fight the guy, you don't have to chase him," Galluzzo says. "It's an easy way to make an arrest. And they're under pressure to make arrests." A poster on Officer.com, a verified online message board for law enforcement officers, put it bluntly in 2013 when he advised a rookie to be on the lookout for "GKs": "make sure they have a prior conviction so you can bump it up to that felony!!!"

Most of the D.A.s in the state "have never prosecuted a gravity-knife case, or haven't prosecuted one in 30 years," according to a spokesperson for the District Attorneys Association of the State of New York. Even just beyond the city limits, gravity-knife prosecutions are exceedingly rare. While the population of the Bronx is roughly equal to that of Suffolk County on Long Island, the Bronx prosecuted more than 10 times as many likely cases in 2013 as its counterpart across the water.

Even worse, critics charge, is that officials have prosecuted knife users aggressively while doing little to address the source of those same knives, which are sold openly at reputable retailers all over the city. New York State assemblyman Dan Quart, a Democrat from Manhattan, says there's an obvious contradiction at play: "You can walk in and purchase one of these knives over the counter," he says, "and then walk out and get arrested."

Cases like Neal's that result in long prison sentences are unusual. But thousands end up in handcuffs every year. Of the dozens of cases examined by the *Voice*, few involved instances of violence and most saw individuals arrested for possessing a knife they used for work. Since 2003, knife-carrying maintenance workers, plumbers, coffee-shop employees -- even a Bible-camp counselor -- have landed in jail.

The heaviest consequences fall on economically disadvantaged defendants, attorneys say, those who are least able to fight the charge, but the arrests sometimes cut across class lines. A well-known visual artist, John Copeland was arrested in 2010 for a knife he used to cut canvas in his studio. Nate Appleman, a food-world heavyweight and contestant on *The Next Iron Chef* a few years back, was arrested on account of the pocketknife he uses to open cardboard boxes. Professional photographer Steven Counts had never been in trouble with the law -- not even so much as a speeding ticket -- when he was surrounded by five officers in downtown Manhattan last summer. Counts was on his way to lunch when one of them spotted, on the pocket of his jeans, the clip for a knife he uses to construct studio backdrops. Stagehands are so frequently targeted that the major union representing them started publishing legal advice about pocketknives in its monthly newsletter.

The racial breakdown of stops is also striking. Of the thousands of arrests that resulted from stop-and-frisk encounters, 86 percent of the total involved black or Hispanic suspects. And a *Voice* analysis also shows that white suspects are significantly more likely to be let go, even when they're caught carrying knives. Only 35 percent of white suspects found with knives -- virtually any of which might meet the NYPD's ecumenical definition -- are arrested, while 56 percent of black and Hispanic suspects are ultimately booked.

Carla Glaser, 47, who served as a juror on a gravity-knife case in Manhattan, calls the situation "ludicrous." She still feels sick about the conviction she was compelled to hand out, to a man who was initially stopped by police for being in a city park after nightfall. Although the law was, in her view, deeply flawed, she felt she had no choice but to vote with the majority. Glaser herself carries a Swiss Army knife on her keychain.

"It just seemed like a trumped-up charge," she says. "And it certainly doesn't seem like it's enforced equally across the board."



**A *Voice* analysis of stop-and-frisk data shows wide racial disparities in arrest rates for knives. Gravity-knife arrests are not tracked as a class, which makes it impossible to determine an exact number of such arrests. The Voice's analysis of stop-and-frisk data is based on a pool of knife arrests involving sections 265.01 and 265.02 of the Penal Code -- the statutes that contain the gravity-knife prohibition -- excluding arrests that involved any other kind of weapon or criminal charge. The result is a conservative estimate of the number of arrests under the program, informed by extensive reporting.**

**The original gravity knife** -- the type legislators targeted when they banned them half a century ago -- bears no resemblance to the kind that landed Richard Neal and thousands of others in jail over the last decade. Developed by the German military for use by paratroopers during World War II, the idea behind a gravity knife was simple: An unlucky parachutist who found himself in a tight spot -- tangled in a tree, for example -- would be able to access the knife even with injuries or limited mobility. Simply press a button and the blade would literally fall out of the handle and lock in place.

The knives were legal through the early 1950s and might have stayed that way, if not for a national backlash against their close cousin, the now-infamous switchblade. Cheap, widely available, and intimidating, with blades up to 12 inches, switchblades had become increasingly common during the early part of the 20th century. By the 1950s they had become the stuff of nightmares, closely associated with inner-city youth gangs, thanks in part to films like *Rebel Without a Cause* and *Blackboard Jungle*, which ends in a classroom brawl between a badly outnumbered public school teacher and his crazed, switchblade-wielding students.

*See also: On Switchblades, 'Cheap Dime Store Hoods' and That Wet End, Lachance*



Pocketknives were already a commonplace tool in 1950s America, but the legislature saw these new weapons as something different. Many of the cheapest varieties didn't even have a cutting edge, just a point, and a "knife" like that was not designed for whittling. Some lawmakers argued that they were more dangerous, even, than pistols. Finally, in 1954, New York State became the first to pass a law making them illegal.

The legislature didn't target gravity knives at the time -- they were still rarely seen in the U.S. But after switchblade bans went into effect, the knife industry saw an opportunity. Even though they were nearly identical in design, gravity knives lacked a spring, a key characteristic of the newly illegal switchblades. So manufacturers stuck with warehouses full of worthless knives simply removed the springs and went on selling, calling the new products "gravity knives."

They weren't exactly like the original paratrooper knife, but they were close enough, and

young people eagerly adapted. The *New York Times* noted in 1956 that teenage "hoodlums" had taken to openly taunting police officers with their gravity knives, knowing full well that there was nothing the cops could do. Later that same year, the New York State legislature closed the loophole it had created, designating gravity knives along with switchblades as "dangerous weapons," and banning their sale or possession: the law that still stands today. Other states soon followed suit.

Finally, in 1958, the federal government banned the importation and interstate transport of both switchblades and gravity knives. The prohibition effectively killed the domestic market, and after that, true gravity knives largely vanished from store shelves.



Caleb Ferguson

**Hara Robrish, an attorney with the Legal Aid Society, has been pushing for changes in the gravity-knife law.**

**When she arrives at a midtown café in early April**, Hara Robrish has a huge stack of manila folders cradled against her chest. Dressed in a dark blazer and knit blouse, she moves quickly. She pulls up a metal stool and sets her folders on a tall round table.

The table wobbles slightly. The pile rises almost to her chin.

"I've been interested in this area [of the law] for a very long time," Robrish says with a laugh, eyeing the heap of documents.

Robrish, a staff attorney at the Legal Aid Society since 2005, has been following

gravity-knife cases nearly since her career began. The folders in front of her are filled with newspaper clippings and photographs, purchase receipts and court transcripts from the dozens of cases she's handled over the years. She found gravity-knife cases troubling from the start.

"I was seeing clients who were coming to me with these knives that they were buying at Home Depot and Ace Hardware and True Value," Robrish says. Many had never been in trouble with the law, and didn't seem like the kind of defendant who was up to no good.

"I just couldn't fathom that they were being prosecuted," Robrish says. She peels open one of the folders and, after a moment, pulls out a dog-eared packet of papers and starts reading aloud:

"Client was working as a stagehand and was stopped by police at Times Square....Client was stopped on his way home from work at Starbucks..."

Robrish's clients were continuously baffled by their arrests. They'd never intended to purchase an illegal knife, they said; they'd never even heard of a gravity knife. The ones they owned weren't marketed or labeled as such.

Like so many legal problems, Robrish explains, the crux of the matter comes down to the arcane language of the statute.

Under Penal Law 265.01, a gravity knife is defined as any knife that opens with "the force of gravity or the application of centrifugal force" and has a blade that locks into place by means of a "button, spring, lever, or other device."

Courts have interpreted that to mean that any knife that can be opened with a "wrist flick" -- a movement something like what a fan dancer might do -- qualifies as a gravity knife. A long list of court cases have turned on exactly that question, which seems straightforward enough.

The problem, Robrish came to realize, is that with enough force, and enough practice, virtually any pocketknife can be flicked open like a "gravity knife," whether it was designed to operate that way or not.

"A person might have one of these knives, and they've never in their lives tried to open it that way," Robrish says. "They have no idea that it *does* open that way."

Jim Furgal, a former knife-industry representative who frequently testifies as an expert witness at gravity-knife trials, said the language of the statute is part of the problem. But changes in knife design have also exacerbated the issue.

In the 1960s, most pocketknives looked like the classic Swiss Army variety, Furgal explains. They were designed to be opened with two hands, typically by means of a small fingernail indent on the blade. On two-handed knives like those, the spring pressure holding the blade

in the closed position is considerable. Even with a vigorous flick, it won't open.

But beginning in the mid-1990s, more and more companies began designing their knives to open with only one hand. Most models of this type have a small "thumb stud" on the blade for just this purpose. It's a convenience feature, Furgal explains, so the user can keep one hand free for other tasks.

But that design change had an unfortunate side effect. For a blade to easily open with one hand, the spring pressure holding the blade in the closed position has to be relatively light. That reduced tension makes such knives far easier to "flick."

Simple wear-and-tear compounds the problem, Robrish found. After years of use, the hinge of a knife has a tendency to loosen up; a knife that was perfectly legal when it was purchased could actually become illegal over time. A quarter-turn of a screw is all it takes for a worn-out knife to become a potential felony.

To Robrish, the whole thing seems crazy. The daughter of a longtime defense attorney, Robrish is the kind of passionate public defender who uses words like *unjust* with earnestness. She finds it unbelievable that her clients' fate would hang on such an obviously subjective test. It gives far too much discretion to an officer, in Robrish's view.

Other legal experts offer the same criticism. Galluzzo, the former district attorney, recalled a trial in which an officer bluntly testified about his own haphazard enforcement of the gravity-knife statute.

"The judge was just dumbstruck," Galluzzo says. "The officer said, 'When I find someone with one of these knives, sometimes I arrest him, sometimes I give him a summons, sometimes I just let him go.' " Galluzzo's partner, Zachary Johnson, also a former district attorney in Manhattan, adds that such discretion is supposed to be exercised by prosecutors, not cops on the beat. "An officer should be making an arrest every time or none of the time," Johnson says. "Otherwise it's just not fair."

Anecdotally, many defense attorneys report that the suspects most often arrested are black or Hispanic, a hunch supported by our analysis of stop-and-frisk data. If almost every knife out there is a potential crime, the only thing standing between home and jail is the discretion of an officer -- to flick, or not to flick? And in the aggregate, a *Voice* data analysis shows, officers are nearly twice as likely to arrest non-white suspects, while letting their white counterparts go.

Charney, of CCR, says that this, too, comports with the broader picture of policing in New York City, where racial minorities are far more likely to be prosecuted for crimes of all types. When an officer has discretion, Charney says, "that's where a lot of these implicit racial and ethnic biases come into play."

Robrish wasn't the only one in her office who'd taken note of the gravity-knife problem.

Colleagues had their own accounts; the electricians and building supers; the plumber stopped on a subway platform, in his work uniform, still carrying his tool belt.

Others had noticed too. Daniel Gilloon, a representative with the International Alliance of Theatrical Stage Employees, a trade union, says arrests of its members have become so routine that the leadership had to get involved. Now, several times a month, IATSE's president sits down to send form letters to local D.A.s, on the behalf of this or that member, explaining what the knife is for. In his industry, Gilloon adds, pocketknives aren't just common but, in fact, mandatory equipment. Stagehands who show up without a knife can actually be disciplined for coming to work unprepared. "It happens all the time," he says of the arrests.

Defense attorneys say that D.A.s will often reduce or even drop charges if a suspect can prove the knife is used for work. But for people in informal jobs -- or people whose supervisors aren't attuned to the problem -- that's sometimes easier said than done. And an arrest, even an unjustified one, isn't always something you want to share with your employer.

In 2008, Robrish started collecting stories from her colleagues and compiling the folders that are now bulging at their seams on the café table. She wasn't sure exactly what she was going to do with them. But she felt like she needed to do something.

**Almost every word of the gravity-knife statute has been litigated** at some point in New York's courts. Many of the challenges that make it to appeal have to do with the propriety of a search. Since so many arrests stem from that ubiquitous pocket clip, attorneys have tried, repeatedly, to argue that the clip itself shouldn't constitute probable cause. A wide variety of tools have pocket clips, after all, and there's no way to tell what's attached to the other end, but the courts have so far rejected that defense.

The "flick" itself is another heavily litigated issue. Robrish says she routinely has clients arrested for possession of supposedly "flickable" knives that prove far less flickable when she herself inspects them. In one of her earlier cases, when she examined the recovered knife in the Manhattan prosecutor's office, she found that neither she nor the assistant D.A. were able to duplicate the flick of the arresting officer. Robrish chalks it up to practice. "The police have become very adept at opening these knives," Robrish says -- a sentiment echoed by other attorneys.

Yet defendants often report that arresting officers have to make several attempts to flick a knife open during arrests. Steven Counts, the photographer, says it took "three or four tries" in his case. Clayton Baltzer, the Bible-camp counselor and seminary student who was arrested on a visit to New York in 2007, tells the *Voice* that two officers tried to flick his knife, unsuccessfully, and only a third, after several energetic attempts, was able to make it snap into place.

Defense attorneys say this kind of thing should cast doubt on an arrest. If it takes repeated tries to get a knife to open, maybe it's not a gravity knife after all, they argue. But the statute doesn't say a knife has to open easily with a wrist flick, or that it has to be designed to open that way. Even if an officer can't reproduce the "flick" in court, that's not always a successful defense. On the witness stand during a trial in 2003, a police officer demonstrating a knife's "flickability" managed to get it open on only two out of eight attempts. The defense moved to strike the knife as evidence, arguing that the failures were prima facie illustrations that the knife didn't meet the definition. But the judge denied that motion, ruling instead that the knife had simply "malfunctioned." That defendant got six years in prison when he was convicted.

The term "centrifugal force," contained in the statute, has also been challenged, perhaps for good reason. Strictly speaking, centrifugal force -- which some physics professors call the "false force" -- doesn't exist. Casting your mind back to high school physics class, you might recall learning that the feeling you have while spinning on a merry-go-round is caused by inertia. It's also inertia, some defense attorneys have argued, that causes a knife to "snap" open with a wrist flick -- in other words, the statute has the science wrong.

In 2009, when lawyers for Reginald Herbin tried to introduce a physics expert to explain that fact, the court wouldn't allow him to testify. The physics testimony would have "confused" the jury, the court said, by "defining centrifugal force inconsistently with the statutory definition." Herbin's conviction was affirmed, and he ultimately spent four years in prison.

The courts have also repeatedly held, as they did in Richard Neal's case, that a defendant doesn't have to know a knife is illegal to be charged for possessing it.

But the wide availability of alleged gravity knives is a big concern for defense attorneys. An informal *Voice* survey of several shops in New York City found that knives meeting the statutory definition were common on store shelves as recently as August. In a decision in 2007, the court noted that one specific model of alleged gravity knife had sold 1.7 million units in the previous year alone, more than 60,000 of those in the state of New York.

Robrish, for one, thought it was all terribly unfair. If these knives were so extraordinarily dangerous, why didn't the D.A.s go after the retailers?

In 2010, Manhattan District Attorney Cyrus Vance Jr. did just that. Using hidden cameras, his investigators carried out a series of stings on retail giants like Home Depot and Eastern Mountain Sports, and found them selling what he alleged were gravity knives. The videos are somewhat farcical: Fresh-faced, name-tagged employees struggle, at the direction of investigators, to get the knives on their shelves to flick open, and have a great deal of trouble doing it.

Steve Holmes, a spokesman for Home Depot, the only one of the targeted retailers who

returned calls for comment, said his company didn't realize back then that its knives violated local laws. Vance's office declined to discuss any aspect of the investigation, but a few things are clear: Though Vance determined the stores involved had made more than $1.9 million from the sale of allegedly illegal knives, he offered the largest businesses a "deferred prosecution agreement," a form of legal settlement in which charges are withheld as long as certain conditions are met. People familiar with the investigation say the owners of at least one small store were arrested. But larger companies like Home Depot faced only limited financial consequences. The stores were collectively ordered to hand over 1,343 allegedly illegal knives, and to forfeit proceeds from the previous four years of sales of the knives in question; this was restitution, but not a penalty.

Richard Neal, who was in prison at the time, didn't hear about the raids (which took place as he was still wading his way through the appeals process). But the availability issue came up in one of his briefs. Since these knives were so common, it was reasonable to expect they were legal, his attorneys argued; essentially, he pleaded ignorance.

In a December 2010 brief opposing Neal's release, filed six months after the Home Depot raids, Vance's office refuted that claim. "Of course," they wrote, the sellers of illegal weapons are "also susceptible to criminal prosecution." As proof, the brief cited a *New York Post* article about the raids, remarking, "ignorance of the law is not a valid defense to the commission of a crime."

But ignorance *was* apparently a defense for the retailers involved, as Steve Pokart, an attorney with the Legal Aid Society in Manhattan, points out. He says Vance's settlement offer was "incredibly hypocritical," comparing it to arresting a heroin user while letting the dealer simply give the drug money back.

Robrish was furious when she read about the raids. "These stores were allowed to pay a fine," she says. "But our clients went to jail."

**After years of challenging the language of the law** on every conceivable basis, nothing had budged. But by the winter of 2012, Robrish's files had gotten thick. And a chance encounter at her daughter's preschool would finally give her an opportunity to make use of them when, over coffee and snacks, she started chatting with another parent, Dan Quart, the New York State assemblyman. Compact and serious, with boyish features and a shock of black hair, Quart had done pro bono work in Legal Aid's civil division years before. Today he serves on the assembly's Legislative Subcommittee, which is in charge of drafting new laws -- and correcting old ones. A fortuitous meeting, to say the least. The two started talking shop, and Robrish filled Quart in on the gravity-knife problem.

Quart was intrigued by what he heard; he invited her to make a visit to his Manhattan office and tell him more. A few months later, Robrish and a colleague, William Gibney, arrived with a pitch for the assemblyman, along with a stack of files -- and two props. One was a pocketknife they'd borrowed from a colleague. The other was a screwdriver.

Robrish went through her whole spiel: the unfair arrests, the odd quirks in the statute. And as her final flourish, she produced the pocketknife. By loosening the hinge on the blade, just a bit, she showed Quart how a perfectly legal pocketknife could become a potential felony.

Quart soon began drafting a bill that that contained a small tweak to the gravity-knife law, requiring the prosecutor to prove the defendant had "unlawful intent" for the knife in his or her possession. It's the same fix proposed by the New York State Office of Court Administration, and Quart's bill won the endorsement of the Legal Aid Society and some organized labor groups, including IATSE.



**Tom Carlson. Click for larger version**

Quart thinks it's a reasonable middle ground that still recognizes the dangers knives can pose. Anyone who threatened someone with a gravity knife, for example, would still be liable for prosecution. But simple possession would no longer be enough to put someone in jail. In that sense, it would bring gravity knives in line with other kinds of pocketknives, and ensure that the vagaries of knife design aren't of such material importance.

That knives can be dangerous and even lethal weapons is, as a spokesperson for Vance says, "too obvious to require elaboration." Knives are used in thousands of attacks in New York City every year, many of them fatal. But no law enforcement agency in New York City was willing, even after repeated requests, to explain what makes gravity knives more dangerous than other kinds of folding knives. If the discussion surrounding the original law's passing in 1956 is any indication, the ability of a knife to be brandished quickly, coupled with a folding ability that made it easy to conceal, was seen as good reason to treat it differently under the law.

Aside from brief statements, none of the district attorneys in the five boroughs responded to detailed questions for any other aspect of this story, and the NYPD didn't respond at all. Of the five D.A.s involved, only the office of Bronx District Attorney Robert Johnson was willing to acknowledge that there was "some confusion" about the gravity-knife statute. A spokesperson for Johnson says prosecutors there have been "seeing cases of people using gravity knives for innocent purposes," but that they have been "sorting out" those cases before prosecution, with a number resulting in dismissal. The Manhattan D.A., in a brief statement, notes that many knives have legitimate purposes, but says the legislature has determined that gravity knives, among other types, are "especially susceptible" to being used as dangerous weapons. In other words, the New York City D.A.s believe they're simply

enforcing the laws as written.

**By the time of Robrish's meeting with Quart**, even more opposition to the gravity-knife statute had begun to emerge. But this time it hailed from a very different source.

Arizona-based nonprofit Knife Rights, as its name implies, is sort of like an NRA for knives. Formed in 2006, with endorsements from the likes of Ted Nugent and NRA leader Wayne LaPierre, the group views knives through the prism of the Second Amendment. The organization is about as far as one can get, politically, from a liberal Manhattan assemblyman like Quart. But after Vance's raids in 2010, Knife Rights, too, began to take a keen interest in New York's knife laws. In 2013, the group filed a federal lawsuit against Vance, challenging the state's law on constitutional grounds. The suit, which is ongoing, argues that the law in New York is so vague that it's impossible to know which knives are legal and which aren't, exposing people to prosecution in a way that violates basic rights.

A similar argument has been rejected before in state court. And a reasonable person might say the language of the law, while extremely broad, is actually pretty clear. But Doug Ritter, the group's president, spokesman, and pretty much everything else, thinks he's got a good shot at winning.

"There's simply no way for an honest citizen to know how to comply with the law the way the city is enforcing it," Ritter says. "That is the very essence of 'vagueness,' and that precedent is very well established in law."

If Ritter is successful, it will be another of quite a few recent victories for knife advocates. Over the past six years, laws against switchblades and gravity knives have been rolled back in Arizona, Alaska, New Hampshire, and elsewhere. It's an effort driven, at least partly, by an increasingly vocal "knife lobby," although such a term would have been laughable only a decade ago. There are really only two organizations involved, Knife Rights and its more genteel counterpart, the American Knife and Tool Institute (AKTI), a less strident trade group that forgoes the Second Amendment language that Knife Rights employs. The groups are so tiny as to be virtual non-entities in lobbying terms; neither group's 2012 revenues exceeded low six figures. But they've been making headway.

That the "knife lobby" has found common cause with labor unions and the Legal Aid Society makes for quite an odd pairing. In other states, support for relaxing knife laws has come mostly from the conservative right, Second Amendment true believers, or politicians eager to score points with hunters and outdoorsmen. Even more remarkably, there doesn't appear to be any significant, direct coordination between the two sides in New York.

So when Quart's bill came up for a vote, it seemed like that rarest of things: an almost coincidental bipartisan moment. The support of labor unions and the Legal Aid Society would likely ensure that one side of the aisle would support the bill. And, fresh off a losing

battle over the state's assault-weapons ban, plenty of Republicans in the body would presumably welcome a chance to rep their Second Amendment cred. The casual observer might even have expected a unanimous vote.

But a strange thing happened when Quart's bill came to the floor: It was attacked, immediately and passionately, by one of the most conservative lawmakers in the state. Al Graf, a Long Island Republican, had voted against New York's assault-weapons ban only a few months previously. But he was definitely in favor of this particular weapon restriction.

"Look, I'm a retired police officer," Graf, thick-brogued and burly, told Quart in a testy exchange, "and I've seen gravity knives. I've arrested people with gravity knives. And they're about this big" -- Graf held his hands up, about shoulder-width apart. "Gravity knives were put on the list [of banned weapons] for a reason." The back-and-forth on the assembly floor lasted for several minutes and focused, to Quart's obvious annoyance, on switchblades. "There's no mention of a switchblade in my bill," Quart insisted. The bill ultimately passed 88-17. But all the nay votes, save two, belonged to Republicans.

Those who follow the issue speculate that GOP opposition might stem from concerns about law and order. As one attorney put it, no one wants that vote thrown back in their face the next time some teenager is stabbed to death. The District Attorneys Association of the State of New York, the group most likely to weigh in, says it hasn't taken a position; so do the city's individual D.A.s. And in a conversation with the *Voice* this summer, Quart put it diplomatically: "I assume they [the district attorneys] are not supportive of this legislation."

**Quart's bill landed in the state senate last year**, where it languished for months; today it's effectively dead. Quart says he's determined to reintroduce the measure when the legislature reconvenes after the new year. But a staffer for the senate sponsor, Democrat Dianne Savino, said she might not pursue the legislation this time around.

Meanwhile, in July, a Bronx court took the extraordinary step of setting aside a gravity-knife prosecution "in the interest of justice," the judicial equivalent of jury nullification. While acknowledging that the evidence likely supported the charge, the judge said the higher call of justice demanded the prosecution be rejected. The judge's reasoning -- the wide availability of the knives, the original intent of the statute, outlined in a six-page brief -- would be familiar by now, and the ruling caused something of a stir among knife nerds in the legal community.

Most of the defense attorneys who spoke to the *Voice* were unaware that the gravity-knife provision was being addressed by the legislature. Quart's bill was a low-profile affair, and went largely unnoticed, even among those who worry about the issue.

But Robrish, for one, who helped set the legislation in motion, has been watching closely. She said it was frustrating to see the bill come so close only to meet an undignified demise. She's also not entirely convinced the change will solve the problem.

"It's not a 100 percent solution," Robrish admits. The gravity-knife story is all about gray areas, and introducing a new gray area -- intent -- still might leave some people vulnerable. But Robrish says the change would help eliminate the most egregious cases. And since there's really no defense against a gravity-knife charge under current law, requiring the D.A. to prove unlawful intent would at least give defense attorneys something to work with.

"I think we'll have a really good shot at defense. Or a better shot, I should say." She laughs, and adds, dryly, "But of course, what would be best is if they just got rid of that particular term."

[jcampbell@villagevoice.com][@joncampbell]

## GET THE WEEKLY NEWSLETTER

(*Sent out every Thursday*) Our weekly feature stories, movie reviews, calendar picks and more - minus the newsprint and sent directly to your inbox.

enter email

 Email to Friend    Write to Editor    Print Article           59 points

## We Recommend


Finally, a Movie with Liam Neeson That's as Good as


Here's What the Daily News Robin Williams Cover


Paid Distribution
Why We Should Deny Parole to Vanessa Coleman
(Change.org)


Paid Distribution
Cats Raise A Beautiful Husky Puppy…Now She
(LolBoom)

Recommended by

 nments

**Sign in** or **Create Account**



**242 people listening**