# ORIGINAL

1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------X
     JOSEPH CRACCO,

4
                                  PLAINTIFF,

5

6              -against-          Case No:

7                                 1:14-CV-08235-PAC

8

9    THE CITY OF NEW YORK, Police Officer
     JONATHAN CORREA, Shield 7869, Transit
     Division District 4, and Police Officer

10   JOHN DOE (a fictitious name),

11                                DEFENDANTS.
     ------------------------------------------X

12

13                  DATE: May 11, 2016

14                  TIME: 11:15 A.M.

15

16            DEPOSITION of the Plaintiff,

17   JOSEPH MATTHEW CRACCO, s/h/a JOSEPH CRACCO,

18   taken by the Defendants, pursuant to a

19   Notice and to the Federal Rules of Civil

20   Procedure, held at the offices of the New

21   York County, District Attorney's Office,

22   Special Litigation Bureau, 80 Centre

23   Street, New York, New York 10013, before

24   Deborah Garzaniti, a Notary Public of the

25   State of New York.

```
 1

 2     A P P E A R A N C E S:

 3

 4     JAMES M. MALONEY, ESQ.
          Attorney for the Plaintiff
 5        33 Bayview Avenue
          Port Washington, New York 11050
 6     BY: JAMES M. MALONEY, ESQ.

 7

 8

       NEW YORK COUNTY
 9     DISTRICT ATTORNEY'S OFFICE
       SPECIAL LITIGATION BUREAU
10        Attorneys for the Defendants
          80 Centre Street
11        New York, New York 10013
          BY: ELIZABETH N. KRASNOW, ESQ.
12              - and -
              PATRICIA J. BAILEY, ESQ.
13

14

15                *         *         *
16

17

18

19

20

21

22

23

24

25
```

1

2        F E D E R A L   S T I P U L A T I O N S

3

4

5        IT IS HEREBY STIPULATED AND AGREED by and

6    between the counsel for the respective

7    parties herein that the sealing, filing and

8    certification of the within deposition be

9    waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20       IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24              *     *     *     *

25

```
1                    J. CRACCO
2     J O S E P H   M A T T H E W   C R A C C O,
3     called as a witness, having been first duly
4     sworn by a Notary Public of the State of
5     New York, was examined and testified as
6     follows:
7     EXAMINATION BY
8     MS. KRASNOW:
9          Q.     Please state your name for the
10    record.
11         A.     Joseph Matthew Cracco.
12         Q.     What is your address?
13         A.     514 West 213th Street,
14    apartment 5E, New York, New York 10034.
15         Q.     Good morning.  My name is
16    Elizabeth Krasnow.  We met off the record.
17    I am an Assistant District Attorney here at
18    the New York County District Attorney's
19    office.  We are here today for your
20    deposition in the matter of Cracco versus
21    the City of New York which is currently
22    pending in the Southern District of New
23    York.  I am the attorney for District
24    Attorney Cyrus Vance.
25                    The purpose of today's
```

1                    J. CRACCO

2    gravity knife; correct?

3         A.    Yes.

4         Q.    Did Officer Correa do anything

5    else wrong in your estimation?

6         A.    I think that the multiple

7    attempts were unfair or inaccurate I

8    suppose, maybe.

9         Q.    So you are referring to the

10   fact that it took Officer Correa multiple

11   attempts to open your knife; correct?

12        A.    Yes.

13        Q.    And in your mind, that rendered

14   your arrest inaccurate; correct?

15        A.    Yes.

16        Q.    Why?

17        A.    Because that isn't the way that

18   the knife typically operates.  He was using

19   it in a manner that is not normal.

20        Q.    How did the knife typically

21   operate?

22        A.    There is a small circular hole

23   for the thumb to pivot it open.

24        Q.    The hole that you are referring

25   to is on the blade of the knife?

```
1                          J. CRACCO

2         A.      Correct.

3         Q.      So when you would hold the

4    knife in your hand, you would use your

5    thumb and insert it into the hole to pivot

6    the blade open; correct?

7         A.      Correct.

8         Q.      And in your estimation, that's

9    the way the knife was intended to function;

10   correct?

11                MR. MALONEY:  Objection to the

12           form, only because function is

13           farther than open.

14                MS. KRASNOW:  I am leaving the

15           question as it is.

16                You can read it back.

17                (Whereupon, the referred to

18           question was read back by the

19           Reporter.)

20                MR. MALONEY:  You can answer.

21        A.      Yes, intended to be opened.

22        Q.      Other than what we have already

23   discussed, is there anything else that

24   Officer Correa did wrong in your view?

25                MR. MALONEY:  Can we clarify
```

```
 1                    J. CRACCO
 2     of 2013?
 3          A.     Old Greenwich, Connecticut.
 4          Q.     For how long did you live in
 5     Old Greenwich?
 6          A.     Six months.
 7          Q.     So if September is the ninth
 8     month --
 9          A.     My math is probably wrong.  I
10     am very sorry.
11          Q.     That's okay.
12          A.     It was a rough transitional
13     period.
14          Q.     That would be about March of
15     2014; correct?
16          A.     No.  I am sorry.  I believe I
17     moved out of Connecticut in December.
18          Q.     December of 2013?
19          A.     Yes.
20          Q.     So you were in Old Greenwich
21     for approximately three months then?
22          A.     Maybe it was four months and
23     then the move away from Brooklyn date was
24     August.  I do not recall a specific time, I
25     apologize.
```

```
1                     J. CRACCO
2          Q.    That's all right.
3                Did you live with anyone in Old
4    Greenwich?
5          A.    Yes.
6          Q.    Who did you live with?
7          A.    Jared, J-A-R-E-D, Sippel,
8    S-I-P-P-E-L.
9          Q.    Mr. Sippel was present with you
10   at the time of your arrest; correct?
11         A.    Correct.
12         Q.    The two of you were co-workers?
13         A.    And roommates.
14         Q.    The residence in Old Greenwich,
15   was that a house or an apartment?
16         A.    Condo.
17         Q.    Did Mr. Sippel own or lease the
18   apartment?
19         A.    No.
20         Q.    Do you know who did?
21         A.    Dan Kilmurray,
22   K-I-L-M-U-R-R-A-Y.
23         Q.    Did he live there as well?
24         A.    No, he did not.
25         Q.    How did it come to be that you
```

1                          J. CRACCO

2      and Mr. Sippel moved into the condo?

3           A.    Mr. Sippel's girlfriend is the

4      daughter of Dan Kilmurray.  Her name is

5      Lindsey.  They had an empty space from the

6      grandmother going into a retirement home.

7           Q.    Did Lindsey live there with you

8      and Jared?

9           A.    Briefly, yes.

10          Q.    How did you first meet Mr.

11     Sippel?

12          A.    We cooked together in San

13     Francisco.

14          Q.    When?

15          A.    In 2010.

16          Q.    At a restaurant?

17          A.    Yes.

18          Q.    What was the name of the

19     restaurant?

20          A.    Quince, Q-U-I-N-C-E.

21          Q.    For how long did you work

22     together at Quince?

23          A.    A year, maybe longer.

24          Q.    Would you describe Mr. Sippel

25     as a friend of yours?

1                          J. CRACCO

2          A.     Yes.

3          Q.     Going back to your residences

4    then, where did you move after you left the

5    apartment with Mr. Sippel in Old Greenwich?

6          A.     Manhattan, 207th Street.  I am

7    trying to remember.  I am forgetting the

8    address right now.  I am sorry.

9          Q.     Why did you leave the condo in

10   Old Greenwich?

11         A.     To work in Manhattan.

12         Q.     Weren't you working in

13   Manhattan when you lived in Old Greenwich?

14         A.     Yes.

15         Q.     Why did you leave the condo in

16   Old Greenwich?

17         A.     To be closer to it.

18         Q.     Where were you working at the

19   time?

20         A.     At the time of the arrest?

21         Q.     Yes.

22         A.     Brooklyn Fare, F-A-R-E.

23         Q.     Where is that located?

24         A.     There was two locations, one in

25   Brooklyn near Jay Street and then one in

1                         J. CRACCO

2       Manhattan on West 27th.

3            Q.    Were you still working at

4       Brooklyn Fare when you moved to 207th

5       Street?

6            A.    No.

7            Q.    When did you stop working at

8       Brooklyn Fare?

9            A.    November of 2013.

10           Q.    Why did you stop working there?

11           A.    I was let go.

12           Q.    Why were you let go, was a

13      reason given to you?

14           A.    They weren't ready for the

15      opening.  It still hasn't opened.

16           Q.    What was the name of the place

17      where you worked after Brooklyn Fare?

18           A.    Marea, M-A-R-E-A.

19           Q.    When did you start working at

20      Marea?

21           A.    December possibly.

22           Q.    For how long did you live at

23      207th Street?

24           A.    One year.  Just over one year,

25      14 months.

```
1                    J. CRACCO

2          Q.     I am going to direct your

3    attention to October 18, 2013, which is the

4    date of your arrest.  Do you recall what

5    day of the week October 18, 2013 fell on?

6          A.     I do not.

7          Q.     Do you recall if it was a

8    weekday or a weekend?

9          A.     Probably a weekday.

10         Q.     Why do you say that?

11         A.     I don't know.  I just think it

12   was a weekday.  I do not recall

13   100 percent.

14         Q.     As of that date, how old were

15   you?

16         A.     27.

17         Q.     As of that date, where did you

18   live?

19         A.     Old Greenwich, Connecticut.

20         Q.     At the time you lived with Mr.

21   Sippel; correct?

22         A.     Correct.

23         Q.     Have you ever lived with Mr.

24   Sippel before, other than that period of a

25   few months in Old Greenwich?
```

J. CRACCO

1

2       A.      The two months in Brooklyn or

3    the brief time in Brooklyn when I first

4    moved to New York.  I said I was staying at

5    a place in Brooklyn.

6       Q.      Mr. Sippel was staying there as

7    well?

8       A.      Yes.

9       Q.      On any other occasions did you

10   live with Mr. Sippel?

11      A.      No.

12      Q.      As of October 18, 2013, you

13   were employed by Brooklyn Fare; correct?

14      A.      Correct.

15      Q.      Did you work out of both

16   locations?

17      A.      Yes.

18      Q.      On October 18, 2013, were you

19   working in the Manhattan location?

20      A.      Yes.

21      Q.      Was the restaurant opened for

22   business at the time?

23      A.      No.

24      Q.      Was it in the process of

25   opening for business?

```
 1                    J. CRACCO

 2         A.    Yes.

 3         Q.    When did you start working

 4    there?

 5         A.    Approximately July.

 6         Q.    July of 2013?

 7         A.    Yes.

 8         Q.    What was your job title, if you

 9    had one?

10         A.    I was sous chef of the

11    Manhattan location of Brooklyn Fare and

12    just to clarify, Brooklyn Fare is a

13    restaurant and grocery store.  The

14    restaurant is not opened, but the grocery

15    store is, so there are multiple.

16         Q.    So at the time you were working

17    there in October of 2013, the grocery store

18    was opened?

19         A.    I can't remember exactly.  I

20    think it might have been.  I am not sure.

21         Q.    But you can't be sure?

22         A.    I am not sure.  As far as

23    dates, I am not for sure.

24         Q.    Now the restaurant part of

25    Brooklyn Fare never opened in the Manhattan
```

1                    J. CRACCO

2    location; correct?

3         A.    Correct.

4         Q.    But as of October of 2013, it

5    was in the process of attempting to open;

6    right?

7         A.    Correct.

8         Q.    And the restaurant had a second

9    component which was the grocery store;

10   correct?

11        A.    Correct.

12        Q.    You can't be sure if the

13   grocery store was opened in October of

14   2013?

15        A.    Correct.

16        Q.    But eventually it did open?

17        A.    Yes.

18        Q.    Is it open today?

19        A.    Yes.

20        Q.    What were your responsibilities

21   as sous chef?

22        A.    Because the restaurant wasn't

23   opened yet, I was responsible for setting

24   up the prep kitchen for the grocery store.

25   So that meant unpacking large pieces of

1                          J. CRACCO

2    equipment, metro shelving, large like

3    pallets of inventory, five gallon buckets

4    of hood cleaning solution, and setting all

5    of the equipment up, hiring, training,

6    ordering, cooking.

7            Q.    So the grocery store itself had

8    a kitchen?

9            A.    Yes.

10           Q.    Because when it opened, it

11   would sell prepackaged food, that was the

12   idea?

13           A.    Correct.

14           Q.    And as the sous chef, did you

15   actually cook in this prep kitchen or were

16   you setting up to open as you described?

17           A.    All of the above.

18           Q.    Can you please take me through

19   what you did on the morning of October 18,

20   2013, starting with when you first woke up?

21           A.    I don't recall.

22           Q.    You were living in Old

23   Greenwich at the time; right?

24           A.    Yes, we had to -- we commuted

25   on the Metro North, like 7 o'clock trains.

```
1                    J. CRACCO
2         Q.    7:00 a.m.?
3         A.    Yes, maybe it was 6:00 because
4    we had to be there by 7:00.  I don't know,
5    but it was early.  Probably got to work --
6         Q.    Did you go with Mr. Sippel?
7         A.    Yes.
8         Q.    You took the train from Old
9    Greenwich to Grand Central Station;
10   correct?
11        A.    Correct, and then the shuttle
12   to the west side and then worked.  On our
13   way home from work --
14        Q.    Before we get to when you were
15   leaving work, could you tell me what you
16   did at work that day?
17        A.    I don't recall specifics.
18        Q.    Do you recall anything that you
19   did at work that day?
20        A.    Not specifically.
21        Q.    Who else was with you at work
22   that day?
23        A.    There were half a dozen
24   employees in the kitchen at that time, plus
25   multiple deli, grocery store employees.
```

1                    J. CRACCO

2         Q.     What were the employees in the

3    kitchen doing?

4         A.     I don't recall.

5         Q.     What were the employees in the

6    deli doing?

7         A.     I do not recall.

8         Q.     When you say "half a dozen," is

9    that total between the kitchen and the

10   deli?

11        A.     No.  In total at the restaurant

12   there were probably or in the building at

13   that time there were 12 employees, possibly

14   more.  I do not recall specifics.

15        Q.     Again, you can't recall if the

16   grocery store was opened as of that date?

17        A.     I don't remember.

18        Q.     Is there anything at all that

19   you can recall doing at work that day?

20        A.     Unpacking boxes, yes, because I

21   remember I had glue residue from like the

22   clear packing tape from the boxes on my

23   knife.  I even pointed that out to the

24   officer.

25        Q.     What type of boxes were you

J. CRACCO

2   unpacking?

3       A.    I don't remember what it was.

4   It was a lot of them.

5       Q.    Large boxes, small boxes?

6       A.    Large boxes.

7       Q.    What was in the boxes?

8       A.    I don't recall.  It could have

9   been shelving.  It could have been a lot of

10  things.  I don't recall specifically.

11  There was a lot that day.

12      Q.    Can you describe for me how you

13  unpacked the boxes?

14      A.    I used my knife to cut the

15  packing tape, packing straps, because we

16  were receiving a lot of pallets of

17  inventory and they always have large

18  packing straps and they are wrapped in

19  bubble wrap or sticky tape, clear-sided

20  tape, and then breaking down the cardboard

21  and putting the inventory away.

22      Q.    And that's the same knife that

23  you had on your person when you were

24  arrested; correct?

25      A.    Yes.

```
 1                    J. CRACCO
 2        Q.     That's the knife that Officer
 3   Correa determined to be a gravity knife;
 4   correct?
 5        A.     Correct.
 6        Q.     Did there come a time when you
 7   left work?
 8        A.     Yes.
 9        Q.     What time was that?
10        A.     Shortly before I was arrested.
11        Q.     Do you remember approximately
12   what time?
13        A.     I do not.
14        Q.     How long of a day would you
15   normally work around that time period in
16   October of 2013?
17        A.     12 hours.
18        Q.     You mentioned earlier that you
19   had to be at work by 7:00 a.m.?
20        A.     Yes.
21        Q.     Would it be fair to say then
22   that you left work at approximately
23   7:00 p.m.?
24        A.     Possibly.  I might have left
25   early that day.  I do not recall.
```

```
 1                      J. CRACCO
 2          Q.     When you left work, what did
 3    you have with you?
 4                  MR. MALONEY:   Objection to the
 5            form.   You can answer.
 6          A.     My backpack, clothes, shoes.
 7          Q.     Did you have your knife?
 8          A.     Yes.
 9          Q.     You mentioned that you had a
10    backpack?
11          A.     Yes, or this backpack actually,
12    a little side satchel.
13          Q.     The same bag that you brought
14    to the deposition today?
15          A.     Yes.
16          Q.     For the record, I am looking at
17    it right now.   It is a brown and black
18    messenger bag that looks to fit, what would
19    you say, three gallons maybe?
20          A.     Sure.
21          Q.     You mentioned that you had the
22    knife as well when you left work?
23          A.     Yes.
24          Q.     Where was the knife?
25          A.     In my right pants pocket.
```

1                      J. CRACCO

2          Q.    Front or back?

3          A.    Front.

4          Q.    Was it clipped to your pocket?

5          A.    Yes.

6          Q.    So the clip was visible?

7          A.    Yes.

8          Q.    If somebody were to look at

9    you?

10         A.    Yes.

11         Q.    Was anyone with you when you

12   left work?

13         A.    Jared Sippel.

14         Q.    Anyone else?

15         A.    No.

16         Q.    Why did you have the knife

17   clipped to your pants?

18         A.    That is where I always kept it.

19         Q.    Is that where you kept it when

20   you were at work?

21         A.    Yes.

22         Q.    Why did you keep it clipped to

23   your pants when you were at work?

24         A.    That's where I always kept it.

25         Q.    Is it because it was easily

1                       J. CRACCO

2    accessible to you when it was clipped to

3    your pants?

4         A.    Yes.

5         Q.    When you left work, why didn't

6    you put the knife in your backpack?

7         A.    Because I always kept it in my

8    pocket.

9         Q.    Did you think that you would

10   need to use the knife on the subway?

11        A.    No.

12        Q.    Is there any reason, other than

13   the fact that that's where you always kept

14   it, why you left the knife clipped to your

15   pants when you left work?

16        A.    No.

17        Q.    So where did you go after you

18   left work?

19        A.    The S Train.  I transferred off

20   47th Street to Grand Central to take the

21   Metro home.

22        Q.    Did there come a time when you

23   were arrested?

24        A.    Yes.

25        Q.    What led up to your arrest?

```
 1                         J. CRACCO
 2    Let's start earlier.  Were you arrested in
 3    the station where you took the S Train or
 4    did that happen when you got to 42nd
 5    Street?
 6         A.     When we got to 42nd Street, it
 7    was coming off the platform, I had just
 8    started to take the stairs up to Grand
 9    Central and Officer Correa stopped me.
10         Q.     So you were coming off the
11    platform from the S Train?
12         A.     Correct.
13         Q.     Where were you when you first
14    saw Officer Correa?
15         A.     On the platform.
16         Q.     So you first saw him on the
17    platform, but then he actually stopped you
18    as you were on the stairs?  I am just
19    trying to understand how this happened.
20         A.     Yes.
21         Q.     What was he doing when you
22    first saw him on the platform?
23         A.     Standing there.
24         Q.     Did he say anything to you?
25         A.     Hey you or something along
```

1                     J. CRACCO

2    those lines.

3          Q.    Did he ask you to stop?

4          A.    Yes, yes.

5          Q.    Where were you when he asked

6    you to stop?

7          A.    On the stairs.

8          Q.    On the stairs going up into

9    Grand Central?

10         A.    Correct.

11         Q.    Did he say anything to you at

12   that point?

13         A.    Yes.

14         Q.    What did he say?

15         A.    I don't recall specifics.  Hey,

16   come here, and then he asked if that was a

17   knife.  I said -- I think that is what he

18   said, something along those lines.  He

19   referenced my pocket knife and I gave it to

20   him.

21         Q.    Did he ask for it or did you

22   just give it to him?

23         A.    I am pretty sure he asked for

24   it.

25         Q.    Did you hand it to him?

1                    J. CRACCO

2          A.    I am pretty sure, yes.  I am

3    pretty sure I handed it to him.

4          Q.    Where was Mr. Sippel at this

5    point?

6          A.    Like more up the steps.

7          Q.    Where were you in relation to

8    Mr. Sippel?

9          A.    The bottom of the steps.

10         Q.    Was the subway crowded at that

11   time?

12         A.    No.

13         Q.    Were the stairs crowded at that

14   time?

15         A.    No.

16         Q.    Was it rush hour?

17         A.    I don't think so.

18         Q.    How many steps above you was

19   Mr. Sippel?

20         A.    I don't know specifically.

21         Q.    What happened after you gave

22   Officer Correa the knife?

23         A.    He attempted to open it with a

24   whipping motion and --

25                MS. KRASNOW:  For the record,

J. CRACCO

1
2        the Witness flicked his wrist when he
3        testified about the whipping motion.
4        Q.    Is that a fair
5   characterization?
6        A.    That is, yes, of course.   And
7   then -- I am sorry.   Where were you?
8             MS. KRASNOW:   Can you read back
9        my last question.
10            (Whereupon, the referred to
11       question was read back by the
12       Reporter.)
13       Q.    The whipping motion that you
14   described where you demonstrated by
15   flicking your wrist, did Officer Correa do
16   the wrist flick away from his body?
17       A.    Yes.   I mean you couldn't flick
18   it towards you, but.
19       Q.    What happened after Officer
20   Correa flicked his wrist while holding the
21   knife?
22            THE WITNESS:   Read it back to
23       me.   I apologize.
24            (Whereupon, the referred to
25   question was read back by the

1                         J. CRACCO

2          Reporter.)

3          A.     It didn't open.  It didn't

4    open.  On the fifth try it opened and he

5    said, oh, it is a gravity knife.  No, it is

6    not.  It took you five tries.  Oh, it

7    doesn't matter.  And then he searched me.

8    He handcuffed me, then searched me, then

9    took me to jail.  Not to jail.  I had to go

10   to some other train platform where I stood

11   waiting handcuffed for a while and then we

12   went above ground and some other cops

13   picked us up and then we drove to a

14   different station, central booking, I

15   presume.

16         Q.     When you say that it took him

17   five tries to open the knife, do you mean

18   that it took him five flicks of his wrist

19   to open the knife?

20         A.     Yes.

21         Q.     Did the knife open on the fifth

22   time that Officer Correa flicked his wrist?

23         A.     Yes.

24         Q.     Did the blade lock into place?

25         A.     I don't remember.

1                          J. CRACCO

2          Q.     Have you ever attempted to open

3    your knife in that manner?

4          A.     No.

5          Q.     Where was Mr. Sippel when

6    Officer Correa was attempting to open the

7    knife?

8          A.     I don't know because I was

9    facing the officer.

10         Q.     Was Mr. Sippel behind you then?

11         A.     Yes.

12         Q.     So you couldn't see him?

13         A.     Correct.

14         Q.     At any point during your

15   encounter with Officer Correa, did Mr.

16   Sippel say anything to the officer?

17         A.     Yes.

18         Q.     What did he say?

19         A.     I don't recall.  I know they

20   spoke briefly.

21         Q.     Do you recall anything about

22   the substance of what was said between

23   them?

24         A.     I don't.

25         Q.     Were there any --

1                          J. CRACCO

2          A.      Oh, yes.   He explained to him

3     he was my boss and we were working.

4          Q.      Did Mr. Sippel say anything

5     else to Officer Correa?

6          A.      I don't recall.

7          Q.      Do you recall if Officer Correa

8     said anything to Mr. Sippel?

9          A.      Yes, but I don't recall what.

10         Q.      Besides Officer Correa, were

11    there any other officers present at the

12    scene of your arrest?

13         A.      No.

14         Q.      You mentioned that Officer

15    Correa searched you.   Did that search take

16    place on the subway platform?

17         A.      Yes.

18         Q.      What did the search consist of?

19         A.      Searching my backpack and

20    patting me down.

21         Q.      Anything else?

22         A.      No.

23         Q.      At some point you mentioned

24    that you were taken to the station, is that

25    the word that you used?

```
1                        J. CRACCO

2          A.    Yes.

3          Q.    The police station you mean?

4          A.    Yes.

5          Q.    Also known as a precinct?

6          A.    Sure.

7          Q.    What happened when you got to

8     the precinct?

9          A.    I was put in a holding cell.  I

10    did processing paperwork, then I was put in

11    a holding cell.

12         Q.    For how long were you at the

13    precinct?

14         A.    Between three and five hours.

15    I do not recall.  I didn't have a watch or

16    phone to keep track of time.

17         Q.    Did Officer Correa ask you for

18    your address at any point?

19         A.    I am sure he did.

20         Q.    What address did you give him?

21         A.    Connecticut, Old Greenwich.

22         Q.    Are you sure about that?

23         A.    Yes.

24         Q.    Were you given a desk

25    appearance ticket?
```

```
1                    J. CRACCO

2      A.     Yes, I think so.

3      Q.     At some point you were released

4  from the precinct; right?

5      A.     Yes.

6      Q.     You didn't go directly to

7  court; correct?

8      A.     Correct.

9      Q.     Before you left the precinct,

10 were you given a piece of paper to explain

11 to you when you had to appear in court?

12     A.     Yes.

13     Q.     Who gave you that piece of

14 paper, did Officer Correa give it to you?

15     A.     At the time of my release, he

16 gave me some paperwork.  I am not sure if

17 other people gave me paperwork as well.  I

18 am sorry.

19     Q.     It's okay.

20            MS. KRASNOW:  Can you mark this

21     as Exhibit A, please.

22            (Whereupon, the aforementioned

23     document was marked as Defendant'S

24     Exhibit A for identification as of

25     this date by the Reporter.)
```

```
 1                    J. CRACCO
 2    still opened today; right?
 3         A.    Correct.
 4         Q.    Is it open under the same name?
 5         A.    Yes.
 6         Q.    So if I looked it up, I would
 7    expect to see that the address is 431 West
 8    37th Street?
 9         A.    I believe so.
10         Q.    I don't have anymore questions
11    about that exhibit.
12               The knife that you were
13    arrested with, what type of knife was it,
14         A.    Spyderco.  S-P-Y-D-E-R-C-O.  I
15    could be wrong.  It's an approximation.
16         Q.    Was it a folding knife?
17         A.    Yes.
18         Q.    When did you buy it?
19         A.    A long time ago.  I do not
20    recall when.  I had that same knife since I
21    was a child, but I lost it once and I
22    bought the same knife again.  So in total
23    that make and model, ten years, that would
24    be a fair.
25         Q.    Would it be fair to say that
```

1                    J. CRACCO

2    the particular knife that you had on the

3    date of your arrest you had owned for at

4    least several years prior to your arrest?

5           A.    Yes.

6           Q.    Where did you buy that knife?

7           A.    I do not recall.

8           Q.    In California?

9           A.    I don't remember.

10          Q.    What did you use it for,

11   generally speaking?

12          A.    Opening boxes.  I worked as a

13   chef in California as well.  Again, opening

14   boxes, opening packaging.  You can use it

15   to open a beer bottle.

16          Q.    How?

17          A.    Sideways, just kind of

18   (indicating).  Like people use a lighter to

19   use it for leverage.

20          Q.    You use the blade of the knife?

21          A.    Unopened, the side of the blade

22   to be used to open a beer bottle as well.

23          Q.    Or you can use a beer bottle

24   opener also?

25          A.    If you had one at the time.

```
1                      J. CRACCO
2          Q.    Did you ever use your knife
3    other than in connection with your work or
4    to open a beer bottle?
5          A.    Yes.
6          Q.    How?
7          A.    Cutting things.
8          Q.    What types of things?
9          A.    I worked on cars a lot, so, you
10   know, tubing for engines or cleaning out
11   under my fingernails.  Multiple uses.  It
12   was the first tool invented by man, the
13   knife.
14         Q.    When you say you worked on
15   cars, was that a hobby?
16         A.    Yes.
17         Q.    Or was that employment?
18         A.    Hobby.
19         Q.    Before your arrest in October
20   of 2013, had you ever carried the knife in
21   New York City through the subway?
22         A.    Yes.
23         Q.    On how many occasions?
24         A.    Multiple.
25         Q.    Did you regularly carry it
```

1                          J. CRACCO

2      through the subway?

3              A.     Yes.

4              Q.     Did you carry the knife around

5      with you often?

6              A.     Yes.

7              Q.     Is it fair to say that you

8      almost always had it on your person?

9              A.     Yes.

10             Q.     Would you regularly wear it

11     clipped to your pants in the manner that

12     you wore it on the date of your arrest?

13             A.     Yes.

14             Q.     You mentioned that on the date,

15     the specific date of your arrest, you used

16     the knife at work to open boxes; is that

17     correct?

18             A.     Yes.

19             Q.     Could you have used any other

20     type of knife to open boxes?

21             A.     Yes.

22             Q.     Could you have used a straight

23     edge knife?

24             A.     There were, as I was saying,

25     many pallets with packing straps where a

                          J. CRACCO

1
2    serrated blade is more efficient.  It cuts

3    more easily.

4         Q.    Well, you were working in a

5    kitchen; correct?

6         A.    Yes.

7         Q.    Were there knives with serrated

8    blades in the kitchen?

9         A.    Yes, but they were for food

10   use.  Not for non-food items.

11        Q.    Would it be possible to

12   designate one of those knives for non-food

13   items?

14        A.    Yes.

15        Q.    Could you also have used a pair

16   of scissors to open the boxes?

17        A.    If I had a pair of scissors on

18   me, yes.

19        Q.    Could you have left your knife

20   at work at the end of the day?

21        A.    I could have.

22        Q.    Around that time period, were

23   you using your knife, other than at work?

24        A.    Yes.

25        Q.    For what?

```
 1                    J. CRACCO
 2          A.    The same uses that I would
 3    normally use it for, cutting things,
 4    opening beer bottles, cleaning fingernails.
 5          Q.    Around that time period were
 6    you working on cars?
 7          A.    On motorcycles.
 8          Q.    Did you own a motorcycle?
 9          A.    I do.
10          Q.    Did you have it in Old
11    Greenwich?
12          A.    I did.
13          Q.    Did you use the knife to work
14    on the motorcycle?
15          A.    If needed.
16          Q.    Do you recall using the knife
17    to work on the motorcycle in and around
18    October of 2013?
19          A.    Not specifically.
20          Q.    I think earlier we spoke about
21    how you would open your knife by using your
22    thumb, placing your thumb inside of a hole
23    on the blade and maneuvering the blade
24    open; correct?
25          A.    Yes.
```

1                    J. CRACCO
2    while holding the knife after several
3    attempts, thereby relieving the blade which
4    locked in place.  It did not require manual
5    locking.
6         Q.    So in order to reflect what
7    really happened in your estimation, Exhibit
8    B would have to be amended to reflect the
9    fact that it took Officer Correa several
10   attempts to open the knife; correct?
11        A.    And it is also his
12   interpretation of what a gravity knife is.
13        Q.    In your estimation then, is
14   this document, the document signed by
15   Officer Correa, misleading in the fact that
16   it omits the fact that it took him multiple
17   attempts to open the knife?
18        A.    Yes.
19        Q.    So a person reading this
20   document would assume that he was able to
21   open the knife with the first flick of his
22   wrist; correct?
23        A.    Correct.
24        Q.    Do you see on Exhibit B right
25   underneath the charge it says on or about

1                      J. CRACCO

2      October 18, 2013 at 4:17 p.m. in the subway

3      station?

4              A.     Yes.

5              Q.     Does that refresh your

6      recollection as to the time of your arrest?

7              A.     Sure, yes.

8              Q.     So you have no reason to think

9      that that time is not accurate?

10             A.     Not to my knowledge.

11             Q.     Are you aware that in

12     connection with the underlying criminal

13     matter, your attorney raised a

14     constitutional challenge to the gravity

15     knife statute?

16             A.     Yes.

17             Q.     How do you know that?

18             A.     We discussed that.

19             Q.     I don't want you to talk to me

20     about what you discussed with your

21     attorney, but you mentioned earlier that

22     you reviewed the papers that were filed in

23     your defense in the underlying criminal

24     matter; correct?

25             A.     Yes.

<pre>
 1                    J. CRACCO

 2        Q.    Had you ever opened your knife

 3   with one hand in any other manner than the

 4   one that I just described?

 5        A.    No.

 6        Q.    The District Attorney's office

 7   filed charges against you as a result of

 8   your arrest; correct?

 9        A.    I believe so.

10        Q.    Do you know what the charges

11   were?

12        A.    Possession of a gravity knife.

13        Q.    Have you ever seen a copy of

14   the criminal court complaint that was filed

15   against you in connection with your arrest?

16        A.    Possibly.

17             MS. KRASNOW:  Can you mark this

18        as Exhibit B.

19             (Whereupon, the aforementioned

20        document was marked as Defendant's

21        Exhibit B for identification as of

22        this date by the Reporter.)

23        Q.    Mr. Cracco, I am showing you

24   what has been marked as Defendant's Exhibit

25   B for the purposes of this deposition.
</pre>

```
1                      J. CRACCO
2      Take a moment to review the document and
3      let me know when you are done.
4             A.     Okay.
5             Q.     Have you had an opportunity to
6      review the document?
7             A.     Yes.
8             Q.     Have you seen that document
9      before today?
10            A.     Yes.
11            Q.     When did you see it?
12            A.     After my arrest, I believe.
13            Q.     Do you see that the document is
14     signed by Officer Correa?
15            A.     Yes.
16            Q.     Do you see that the document
17     sets out alleged facts surrounding your
18     arrest?
19            A.     Yes.
20            Q.     You've had a chance to look at
21     those facts; right?
22            A.     Yes.
23            Q.     Are they accurate?
24            A.     My name is misspelled.
25            Q.     Let's start there.   Where is
```

1                    J. CRACCO

2    your name misspelled?

3         A.    It is J-O-S-E-P-H.

4         Q.    In the caption?

5         A.    Indeed.

6         Q.    Let's circle back to the

7    alleged facts that are set out in the

8    documents surrounding your arrest.

9         A.    Got it.

10        Q.    Are those facts accurate?

11        A.    I don't believe I -- I do not.

12        Q.    Well, let me read what I am

13   referring to when I say the facts, then I

14   will ask the question again.

15        A.    Sure.

16        Q.    So in the lower portion of the

17   document it says:  "I know that the knife

18   was a gravity knife because I opened the

19   knife with centrifugal force by flicking my

20   wrist while holding the knife, thereby

21   releasing the blade which locked in place

22   by means of an automatic device that did

23   not require manual locking."

24              Do you see where those words

25   are reflected in the document?

```
1                        J. CRACCO

2         A.    Yes.

3         Q.    Is that factual narrative

4    accurate?

5               MR. MALONEY:  Objection to the

6               form.  It states what the officer

7               knows.

8               MS. KRASNOW:  I am leaving the

9               question as is.

10        Q.    You can answer it.

11              MR. MALONEY:  You can answer.

12        A.    That is the officer's

13   interpretation of it, yes.

14        Q.    But from your perspective, is

15   it accurate, is it true?

16        A.    I think that the way it is

17   worded implies that it happened with one

18   simple flick of the wrist, which is not the

19   case.

20        Q.    What could be changed in that

21   portion that I just read to reflect the

22   true version of events as you see them?

23        A.    Officer Correa believes it was

24   a gravity knife because the knife opened by

25   centrifugal force by flicking my wrist
```

1                    J. CRACCO

2          A.    I don't know.  I don't know.  I

3    am not a lawyer.

4          Q.    What were the circumstances of

5    the arrest involving the fireworks?

6          A.    I purchased fireworks in New

7    Jersey on the 4th of July and lit them off

8    in New York on the 5th of July.

9          Q.    Why did you light them off?

10         A.    To see them.

11         Q.    Did you light them under a car?

12         A.    No.

13         Q.    Where did you light them?

14         A.    On the sidewalk.

15         Q.    Were there cars nearby?

16         A.    Yes.

17         Q.    Did one of the fireworks end up

18   under a car?

19         A.    I don't believe so.

20         Q.    Did the fireworks, in fact, go

21   off?

22         A.    Yes.

23         Q.    Can you be sure that none of

24   the fireworks went off under a car?

25         A.    Yes.

1                    J. CRACCO

2          Q.     How do you know that?

3          A.     The next day I saw the remnants

4    of the firecrackers on the sidewalk in the

5    daytime, sunlight, like I saw them on the

6    sidewalk.

7          Q.     Where did this take place, in

8    New York County?

9          A.     In front of my apartment at

10   207th Street.

11         Q.     What time of night was it?

12         A.     It was late, it was

13   1:00 a.m.-ish.

14         Q.     1:00 a.m.?

15         A.     Ish.   That's an approximation.

16   I am not sure.

17         Q.     Had you been drinking?

18         A.     No.

19         Q.     Was this a weekend or a

20   weekday, July 5th?  Well, I guess to be

21   clear, you said that you lit them at

22   1:00 a.m.  Is that 1:00 a.m. on the morning

23   of July 5th or is that 1:00 a.m. on the

24   morning of July 6th?

25         A.     I don't recall.  By that time

1                        J. CRACCO

2      it might have been the 6th.   I do not

3      recall.   I am sorry.

4            Q.    Was that a weekday, if you

5      know?

6            A.    I do not recall.

7            Q.    Were there a lot of people out

8      at 1:00 a.m. when you lit the fireworks?

9            A.    No.

10            Q.    Did you see children in the

11      vicinity?

12            A.    Yes.

13            Q.    How close were the children to

14      the fireworks when you lit them?

15            A.    Three-quarters of a city block.

16            Q.    Did you know the children?

17            A.    No.

18            Q.    Did you warn them that you were

19      going to light fireworks?

20            A.    No.

21            Q.    Was anyone with you when you

22      lit the fireworks?

23            A.    My girlfriend.

24            Q.    Why did you decide to light the

25      fireworks?

1                           J. CRACCO

2           A.      To celebrate our country's

3    independence.

4           Q.      Did it occur to you that it may

5    be dangerous to do so?

6           A.      Yes.

7           Q.      But you did it anyway?

8           A.      Yes.

9           Q.      You mentioned that you lit them

10   on the sidewalk; correct?

11          A.      Yes.

12          Q.      Were there cars parked along

13   the sidewalk?

14          A.      Yes.

15          Q.      Were there cars parked along

16   the portion of the sidewalk where you lit

17   the fireworks?

18          A.      Yes.

19          Q.      What type of fireworks were

20   these?

21          A.      Firecracker.

22          Q.      How many did you light?

23          A.      I don't recall.

24          Q.      Why did you go to New Jersey to

25   buy the fireworks?

```
1                    J. CRACCO
2         taken.)
3              MR. MALONEY:  I just want to
4         state for the record that we reserve
5         our right under Rule 30(e) of the
6         Federal rules of civil procedure to
7         receive a copy of the transcript for
8         review and correction for 30 days
9         following receipt.  Is that good?
10             MS. KRASNOW:  Yes.
11        Q.    Mr. Cracco, I just have a few
12   follow-up questions.
13        A.    Okay.
14        Q.    Going back to your arrest, when
15   Officer Correa was handling your knife, you
16   testified that he flicked his wrist while
17   holding the knife; correct?
18        A.    Yes.
19        Q.    And that he flicked his wrist
20   away from his body; correct?
21        A.    Yes.
22        Q.    Was that in a downward motion?
23        A.    Yes.
24        Q.    All five attempts, were they
25   the same flick of the wrist away from his
```

1                      J. CRACCO

2    body in a downward motion?

3         A.    They became more violent with

4    each attempt.

5         Q.    But the motion itself was the

6    same, it was just that it was done with

7    more aggression, would that be fair to say?

8         A.    Yes.

9         Q.    We spoke earlier about where

10   you may have gotten the knife that you had

11   on the date of your arrest?

12        A.    Yes.

13        Q.    At the time that you had the

14   knife, you were living in California;

15   correct?

16        A.    No, that's not what I said.  I

17   said I was unaware of where I got that

18   knife.  I had that same model twice.  I do

19   not recall when and where I purchased that

20   one.

21        Q.    Could you narrow down the

22   possible places where you may have bought

23   it?

24        A.    Iowa, California or Minnesota

25   or Illinois.  Sorry.  I am being as

1                    J. CRACCO

2      accurate as possible.

3           Q.      You move around a lot.

4           A.      I do.  That very knife that got

5      taken away from me has been to the

6      Colosseum, to the Roman Colosseum and back.

7      Not that that matters.

8           Q.      So it went on a flight, so

9      you --

10          A.      It was checked.

11          Q.      In your luggage?

12          A.      Yes, many years ago.

13          Q.      Why did you check it in your

14     luggage as opposed to carrying it with you

15     on the plane?

16          A.      Because you can't have knives

17     on planes.  I also brought my cooking

18     knife.  I also cook professionally or I did

19     cook professionally.  Now I sell wine

20     professionally.

21          Q.      You mentioned also that at the

22     time of your arrest there was residue on

23     the knife from the tape that was on the

24     packages that you were opening; is that

25     correct?

1                        J. CRACCO

2          A.     Yes.

3          Q.     Where was the residue?

4          A.     On the tip of the blade.

5          Q.     Was the residue sticky?

6          A.     Yes.

7          Q.     So theoretically, it would make

8     it more difficult to open the knife in

9     flicking your wrist; correct?

10                MR. MALONEY:  Objection to the

11                form.  He has no expertise in this.

12                Also we are talking about the tip of

13                the blade, that is not --

14                MS. KRASNOW:  I am not asking

15                for an expert opinion.

16         Q.     You can answer the question as

17    it was phrased.

18                THE WITNESS:  Can you reread

19                the question.

20                (Whereupon, the referred to

21                question was read back by the

22                Reporter.)

23         A.     No comment.

24         Q.     You have to answer the

25    question.  If you don't know, you don't

1                        J. CRACCO

2    know.

3         A.     I don't know.

4         Q.     But you mentioned to the

5    officer that there was a residue on the

6    knife; right?

7         A.     Explaining it was a work tool.

8         Q.     So you don't know if the

9    residue would have impacted the ability to

10   open the knife?

11        A.     I don't believe it would.

12        Q.     Why not?

13        A.     The shape of the handle and

14   where the tip of the blade rests isn't

15   particularly in contact with the handle and

16   I don't think that the residue would cause

17   any effect.

18        Q.     Did you notice if there was

19   residue anywhere else on the knife?

20        A.     Not to my knowledge.

21        Q.     Is that a no, there was no

22   residue or I didn't observe whether there

23   was residue elsewhere on the knife?

24        A.     I did not see any residue

25   elsewhere on the knife.