ORIGINAL

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   ----------------------------------------X
    JOSEPH CRACCO,
4
                              PLAINTIFF,
5

6           -against-          Case No:

7                         1:14-CV-08235-PAC

8

    THE CITY OF NEW YORK, Police Officer
9   JONATHAN CORREA, Shield 7869, Transit
    Division District 4, and Police Officer
10  JOHN DOE (a fictitious name),

11                        DEFENDANTS.
    ----------------------------------------X
12

13                  DATE: May 11, 2016

14                  TIME: 2:05 P.M.

15

16          DEPOSITION of a Non-Party

17  Witness, JARED SIPPEL, taken by the

18  Defendants, pursuant to a Notice and to the

19  Federal Rules of Civil Procedure, held at

20  the offices of the New York County,

21  District Attorney's Office, Special

22  Litigation Bureau, 80 Centre Street, New

23  York, New York 10013, before Deborah

24  Garzaniti, a Notary Public of the State of

25  New York.

```
1

2      A P P E A R A N C E S:

3

4      JAMES M. MALONEY, ESQ.
         Attorney for the Plaintiff
5         33 Bayview Avenue
          Port Washington, New York 11050
6         BY: JAMES M. MALONEY, ESQ.

7

8
       NEW YORK COUNTY
9      DISTRICT ATTORNEY'S OFFICE
       SPECIAL LITIGATION BUREAU
10        Attorneys for the Defendants
          80 Centre Street
11        New York, New York 10013
          BY: ELIZABETH N. KRASNOW, ESQ.
12             - and -
             PATRICIA J. BAILEY, ESQ.
13

14

15              *          *          *
16

17

18

19

20

21

22

23

24

25
```

1

2          F E D E R A L   S T I P U L A T I O N S

3

4

5          IT IS HEREBY STIPULATED AND AGREED by and

6      between the counsel for the respective

7      parties herein that the sealing, filing and

8      certification of the within deposition be

9      waived; that the original of the deposition

10     may be signed and sworn to by the witness

11     before anyone authorized to administer an

12     oath, with the same effect as if signed

13     before a Judge of the Court; that an

14     unsigned copy of the deposition may be used

15     with the same force and effect as if signed

16     by the witness, 30 days after service of

17     the original & 1 copy of same upon counsel

18     for the witness.

19

20         IT IS FURTHER STIPULATED AND AGREED that

21     all objections except as to form, are

22     reserved to the time of trial.

23

24                    *      *      *      *

25

J. SIPPEL

1
2     J A R E D   S I P P E L, called as a
3     witness, having been first duly sworn by a
4     Notary Public of the State of New York, was
5     examined and testified as follows:
6     EXAMINATION BY
7     MS. KRASNOW:
8         Q.     Please state your name for the
9     record.
10        A.     Jared Sippel.
11        Q.     What is your address?
12        A.      282 11th Avenue, apartment 408,
13    New York, New York 10001.
14        Q.     Hello.  My name is Elizabeth
15    Krasnow.  We met off the record.  I am an
16    Assistant District Attorney here at the New
17    York County District Attorney's office.
18             We are here today for your
19    deposition in the matter of Joseph Cracco
20    versus City of New York which is a civil
21    suit that is currently pending in Federal
22    Court in the Southern District of New York.
23    The Plaintiff is Joseph Cracco and the only
24    remaining Defendant is New York County
25    District Attorney Cyrus Vance and I am the

1                           J. SIPPEL
2           A.       That it was essentially that
3    what he was arrested for is not actually
4    the case, that the knife was not a gravity
5    knife.   When it happened, the officer
6    explained of why he was -- of why he pulled
7    him out of the crowd and started to explain
8    about the knife, and then it just seemed
9    what he was telling us what it was he had
10   trouble doing.   So my understanding is that
11   because of the way it was handled and that
12   it really isn't a gravity knife, that that
13   is what they are fighting.
14           Q.       You mentioned that the officer
15   explained to you something about the knife;
16   right?
17           A.       Correct.
18           Q.       You are referring to Officer
19   Correa who arrested Mr. Cracco; correct?
20           A.       Yes.
21           Q.       What did the officer explain to
22   you about the knife?
23           A.       That first he pulled him out of
24   the crowd because he had the clip showing
25   and he explained that that was illegal in

                    J. SIPPEL

1
2    New York City because it was showing a
3    weapon essentially, and then when he took
4    it from him, after he asked him what did he
5    have it for, what was he using it for, that
6    he didn't know if he was using it to hold
7    someone up in the station or not.  Joe
8    explained that it was for box cutting and
9    essentially we were opening a market in a
10   restaurant and opening boxes all day long
11   and he had that pocket knife for many years
12   as a work knife in the kitchen and whatnot,
13   and that is when the officer went on to
14   explain about a gravity knife, how it could
15   flip open and that --
16          Q.   For the record, can you
17   describe the motion that you just made with
18   your right wrist?
19          A.   Like this (indicating).  He
20   said it has to be -- if you can get it to
21   open like it is a free -- like that is what
22   a gravity knife is, you use the gravity by
23   flicking your wrist to get it to open.
24          Q.   For the record, you were
25   flicking your wrist in a downward motion

1                          J. SIPPEL

2      away from your body?

3            A.      Yes.   He was doing this

4      (indicating).

5            Q.      So the officer explained to you

6      that if a knife opened in that manner, then

7      it would be a gravity knife and it would be

8      illegal under New York law; correct?

9            A.      To my understanding, to my

10     remembrance, yes.

11           Q.      Then you testified that the

12     officer had trouble doing the motion that

13     he described to you; correct?

14           A.      Yes.   It was kind of like he

15     was explaining what it was.   It was not

16     working for him.   It took multiple tries to

17     actually get the knife to open.   It did

18     eventually open.

19           Q.      When you say "multiple tries,"

20     do you mean multiple flicks of the

21     officer's wrist?

22           A.      Yes.

23           Q.      How many attempts did it take

24     to open the knife?

25           A.      I would say at least four, if

J. SIPPEL

1

2  not more.   That is what made it kind of why

3  Joe was kind of not arguing, but inquiring

4  like what you are saying you can't even do

5  and then it happened.

6       Q.    So going back to your

7  understanding of the nature of the lawsuit,

8  you mentioned that you understand Mr.

9  Cracco's claims to be based on the fact

10  that the knife was not a gravity knife?

11       A.    Or that he was wrongfully

12  arrested for a gravity knife when it

13  technically isn't.

14       Q.    Are there any other issues that

15  you understand this lawsuit to address,

16  besides whether or not Mr. Cracco was

17  falsely arrested?

18       A.    No, because that is the only

19  thing I was under the impression of him

20  being arrested for, was for carrying a

21  gravity knife in New York City.

22       Q.    Are you aware that the District

23  Attorney is also a Defendant in this

24  lawsuit?

25       A.    No, not until you told me that.

1                           J. SIPPEL

2           Q.      You are not sure if it is

3      before or after the arrest, but it was

4      around mid October?

5           A.      Correct.  We were working there

6      months beforehand, but the actual opening

7      date, it was either just before or just

8      after.

9           Q.      As of that date, you lived in

10     Old Greenwich; correct?

11          A.      Yes.

12          Q.      With Mr. Cracco; right?

13          A.      Correct.

14          Q.      And your girlfriend?

15          A.      Yes.

16          Q.      How do you know Mr. Cracco?

17          A.      We met in California working at

18     a restaurant together.  We were both sous

19     chefs for a restaurant.

20          Q.      Would you consider him a friend

21     of yours?

22          A.      Yes.

23          Q.      What restaurant were you

24     working at when you met him?

25          A.      Quince.

```
1                    J. SIPPEL
2  definitely in between 9th and 10th on 37th.
3       Q.    What was your position at
4  Brooklyn Fare?
5       A.    Executive chef.
6       Q.    What were your
7  responsibilities?
8       A.    Overseeing of the market, of
9  the prepared foods, as well as executive
10 chef of the restaurant that was to be
11 opened.
12      Q.    I believe you testified that
13 the restaurant never opened?
14      A.    No.
15      Q.    Did there come a time when you
16 stopped working at Brooklyn Fare?
17      A.    Yes.
18      Q.    When was that?
19      A.    March of 2014.
20      Q.    Why did you leave?
21      A.    Because they decided to go a
22 different direction with the restaurant.
23 They wanted to stay with Japanese aesthetic
24 and I am an Italian chef.  The original
25 Brooklyn Fare is Japanese.  They wanted a
```

J. SIPPEL

2  Mediterranean restaurant, that is what I

3  was hired for.  As the restaurant kept

4  getting postponed and drawn out, postponed

5  and postponed, they told me they were going

6  to forgo with the Mediterranean restaurant,

7  that they were going to just bring Brooklyn

8  Fare to Manhattan and stay with the

9  Japanese aesthetics, but it still has never

10 happened.

11     Q.     As of October of 2013, what was

12 Mr. Cracco's position at Brooklyn Fare?

13     A.     Sous chef.

14     Q.     What were his responsibilities

15 as a sous chef?

16     A.     Essentially the restaurant

17 wasn't open, so there was -- we were

18 testing dishes for the soon to be opened

19 restaurant as well as just production of

20 all of the prepared foods in the market.

21     Q.     So was he primarily cooking

22 would you say?

23     A.     Yes.

24     Q.     Did he have any other

25 responsibilities?

1                        J. SIPPEL

2          A.       Overseeing of cooks.  The

3     kitchen is a brigade system, like a

4     military system where there is an executive

5     chef, then sous chefs, then chef de

6     parties, then it kind of just trees out.

7     So any cook would be underneath a sous

8     chef.

9          Q.       So Mr. Cracco --

10         A.       Second in command.  Sorry to

11    interrupt.  Second in command essentially

12    is what a sous chef is.

13         Q.       Thank you.  So in October of

14    2013, Mr. Cracco's responsibilities

15    included cooking and supervising other

16    chefs?

17         A.       Correct.

18         Q.       And you would of been Mr.

19    Cracco's boss; correct?

20         A.       Yes.

21         Q.       As the executive chef?

22         A.       Correct.

23         Q.       To your knowledge, did he have

24    any other job responsibilities in October

25    of 2013, besides cooking and supervising

J. SIPPEL

2    the other chefs that were in the kitchen?

3        A.    Like as things came into the

4    market, we were essentially -- like the

5    restaurant was being built as we were going

6    on.  So overseeing all incoming orders to

7    the market, as well as purchasing for when

8    we bought, you know, pots and pans and

9    things like that for both the market and

10   for the restaurant.  We essentially stocked

11   the restaurant as it was being built for a

12   restaurant to open, then it never opened.

13       Q.    Can you take me through what

14   you did on the morning of October 18, 2013,

15   starting with when you first woke up, to

16   the best of your recollection?

17       A.    I really don't, I really don't

18   remember.  I was taking the 4:40 train

19   every morning.

20       Q.    4:40 a.m.?

21       A.    Yes, to get to work or to get

22   to work in Hells Kitchen at 6:15 a.m.  It

23   is an hour train ride to Grand Central,

24   then take the shuttle over to Times Square,

25   then walk to West 37th.

```
1                    J. SIPPEL
2    that came daily.
3         Q.    So it is possible an order came
4    in that day, but you couldn't recall for
5    sure?
6         A.    I would say yes.  I cannot say
7    for sure, but chances are, yes, we received
8    orders almost daily.
9         Q.    Did there come a time when you
10   left work?
11        A.    Did there come a time when we
12   left work?
13        Q.    Yes.
14        A.    We left work like in the
15   afternoon.  I would say sometime after 4:00
16   to walk to the shuttle to go to Grand
17   Central.
18        Q.    You left with Mr. Cracco;
19   correct?
20        A.    Correct.
21        Q.    You mentioned that you went to
22   the shuttle.  Which train is that?
23        A.    At the Port Authority.  It is
24   the shuttle train that runs back and forth
25   from Grand Central and Port Authority.
```

```
1                    J. SIPPEL
2         Q.    You took that to Grand Central?
3         A.    Correct.
4         Q.    You got out at the platform at
5    Grand Central?
6         A.    Then right, it was right in
7    where that platform ends, the L Train,
8    right as you are coming up the stairs, that
9    was where the officer pulled us over.
10        Q.    When did you first notice
11   Officer Correa?
12        A.    When he came, he kind of
13   like -- we wouldn't notice when we were
14   walking up.  He approached us, excuse me,
15   can you come over to the side with me?  As
16   far as I remember.
17        Q.    Did he say that to both of you
18   or did he just say that to Mr. Cracco?
19        A.    Just to Joe.
20        Q.    Where were you in relation to
21   Mr. Cracco when Officer Correa approached
22   him?
23        A.    We were together, but as they
24   were going on, I kind of could tell that it
25   was a conversation between those two, so I
```

1                    J. SIPPEL

2    was off to the side a little bit.

3        Q.    Was the subway platform

4    crowded?

5        A.    It was at the time when it

6    happened, but then it cleared out because

7    as they were speaking and we were maybe

8    there 20 minutes of discussion, the L Train

9    comes like every ten minutes or so.  So it

10   went from being very busy to when he was

11   pulled aside to clearing out somewhat.

12       Q.    When you say you were standing

13   to the side, what exactly do you mean?

14       A.    I was probably -- I mean I was

15   with him for a little bit, then he pulled

16   him over even more, like off, and that is

17   when I was standing by the stairs and they

18   were over by the wall.

19       Q.    Were you standing on the stairs

20   or by the stairs?

21       A.    I think I was by the stairs.

22       Q.    Had you started to go up the

23   stairs at all?

24       A.    I honestly don't remember.

25   Like I said, for 20 minutes or so, like

1                        J. SIPPEL

2      didn't -- that came off wrong.  Joe was

3      trying to explain his case to the officer.

4           Q.    At any point, did you say

5      anything to the officer?

6           A.    The officer may have -- I don't

7      remember for certain, but he may have asked

8      where we were coming from or what we were

9      doing, but I was not -- like he was not

10     questioning me as he was questioning Joe.

11          Q.    You overheard the officer

12     explain to Joe that if the knife opens by a

13     flick of the wrist, then it is a gravity

14     knife; correct?

15          A.    Correct.

16          Q.    Then you saw with your own two

17     eyes that the officer could not, in fact,

18     open the knife as he described; correct?

19          A.    Correct.

20          Q.    It took him multiple attempts;

21     correct?

22          A.    Correct, but the knife did

23     eventually open.

24          Q.    After the fourth or fifth

25     attempt I believe you testified?

1                    J. SIPPEL

2          A.    Yes.

3          Q.    Was the officer employing the

4    wrist flick with increasing aggression as

5    he was attempting to open it?

6          A.    Yes, the first two as he was

7    trying to show it not opening.   It took a

8    little more force, that is when he finally

9    got it.   It got harder as he kept trying to

10   prove his point.

11         Q.    So he applied more and more

12   force to open the knife?

13         A.    Yes.

14         Q.    Besides Officer Correa, were

15   there any other police officers present?

16         A.    No.

17         Q.    What happened after Officer

18   Correa handled Mr. Cracco's knife?

19         A.    After he proved his point or

20   tried to after he showed him that it

21   happened, that is when I believe that he

22   said he was under arrest, to my knowledge.

23         Q.    What happened next?

24         A.    As he started getting cuffed, I

25   essentially said I will see you later and I

1                          J. SIPPEL

2    question is, to your knowledge, did he ever

3    work on the motorcycle while you were

4    living together?

5              A.    Not to my knowledge.

6              Q.    To your knowledge, did he carry

7    the knife around with him often?

8              A.    Yes, but I don't know if he

9    always had it on him, but yes, I would say.

10   Like I said earlier, if we knew we needed a

11   box cutter or something, you can ask Joe

12   and he would usually have a pocket knife.

13             Q.    How would he carry it usually?

14             A.    Clipped on his pocket with the

15   clip showing, exposed.

16             Q.    Did you have a box cutter at

17   the restaurant?

18             A.    There were some upstairs.

19   Those were more up in the market area where

20   we are down in the kitchen, which is the

21   lower level.

22             Q.    Could they have been brought

23   down to the kitchen?

24             A.    Yes, they could have been.

25             Q.    Were there scissors available

J. SIPPEL

2   to open the boxes that were coming to the

3   restaurant?

4        A.     There were scissors in the

5   kitchen as well.  They were used many times

6   to open boxes.  That is why I would usually

7   tell -- maybe the dishwashers would grab

8   chefs knives and I would try to tell them

9   to use a pair of scissors or to use

10  something duller, anything but the chef

11  knives, and Joe had a pocket knife which

12  was used many times as well.

13       Q.     Are you aware that the District

14  Attorney's office filed charges against Mr.

15  Cracco in connection with his arrest?

16       A.     No.  Well, I knew he was

17  arrested for the gravity knife and I

18  thought that it had been settled.

19       Q.     Have you ever seen a copy of

20  the criminal complaint that was filed

21  against Mr. Cracco?

22       A.     No.

23       Q.     I am going to show you what was

24  used as Exhibit B at the deposition earlier

25  today.  I don't have another copy.

1                    J. SIPPEL

2               MR. MALONEY:   That's okay.

3          Q.    I am showing you what was used

4     as Exhibit B at Mr. Cracco's deposition.   I

5     am just going to ask you to take a minute

6     to read it over.

7          A.    Okay.  That's essentially what

8     I remember, the officer telling Joe what he

9     was being arrested for.

10         Q.    So you have had a chance to

11    review the document; correct?

12         A.    Yes.

13         Q.    The document is signed by

14    Officer Correa; correct?

15         A.    Correct.

16         Q.    And it reflects the fact that

17    Mr. Cracco was arrested on October 18,

18    2013; correct?

19         A.    Correct.

20         Q.    And I want to turn your

21    attention to the factual allegations in the

22    document which are in the final full

23    paragraph before it mentions false

24    statements made in this document are a

25    crime.  Can you just read aloud that

```
 1                    J. SIPPEL
 2    sentence for me.
 3        A.    "I know that the knife was a
 4    gravity knife because I opened the knife
 5    with centrifugal force by flicking my wrist
 6    while holding the knife thereby releasing
 7    the blade which locked in place by means of
 8    an automatic device that did not require
 9    manual locking."
10        Q.    Are those factual allegations
11    by Officer Correa true?
12        A.    Yes, he opened the knife, but
13    he doesn't say how many times it took, but
14    yes, he did open the knife with centrifugal
15    force.
16        Q.    The document omits the fact
17    that it took him multiple attempts to open
18    the knife?
19        A.    Correct.
20        Q.    Would you say it is misleading
21    that it took him multiple attempts to open
22    the knife?
23        A.    I would say it is misleading
24    because it sounds as if he opened it on the
25    first try.
```